LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR. (141757)
BONNY E. SWEENEY (176174)
CHRISTOPHER M. BURKE (214799)
THOMAS G. WILHELM (234980)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
johns@lerachlaw.com
bonnys@lerachlaw.com
chrisb@lerachlaw.com
twilhelm@lerachlaw.com

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS (190264)
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
619/525-3991 (fax)
robbins@ruflaw.com

Attorneys for Plaintiffs

**ORIGINAL FILED**

MAR 7 2006

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

*E-filing*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*EMC*

| | |
|---|---|
| DENNIS BULCAO, ALEXANDER JUSTIN CLARK, MATT PUTMAN, McKENNA CREAMER, GEORGE CREAMER, P. EVAN STEPHENS, KIM HANSON, JAMES MILLER, WAYNE GILBERT, ELISE R. DeVORE and MITCHELL HORTON,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>SONY BMG MUSIC ENTERTAINMENT, SONY CORPORATION OF AMERICA, BERTELSMANN, INC., UNIVERSAL MUSIC GROUP, TIME WARNER, INC., WARNER MUSIC GROUP CORP. and EMI GROUP, PLC,<br><br>                    Defendants. | No. C 06 ___<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS & PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW<br><br><br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

1.      Plaintiffs Dennis Bulcao, Alexander Justis Clark, Matt Putman, George Creamer, McKenna Creamer, P. Evan Stephens, Kim Hanson, James Miller, Wayne Gilbert, Elise R. DeVore and Mitchell Horton, on behalf of themselves and the classes defined herein (the "Classes"), based on information and belief and investigation of counsel, except for information based on their personal knowledge, allege as follows:

2.      This action is brought by Plaintiffs on behalf of all persons and entities who have paid inflated prices for: (1) digitally formatted music offered for sale on the Internet ("Online Music") and (2) compact discs ("CDs"). In furtherance of, and as an integral part of, their conspiracy to fix and maintain prices, Defendants, a combination of the major music labels and media conglomerates, restrained the availability and distribution of Online Music. Defendants engaged in a prolonged pattern of concerted conduct to prevent and delay Online Music from becoming a competitive alternative to their near monopoly of the CD market. Ultimately, when Online Music became inevitable, Defendants then conspired to fix and maintain the prices for such product. As a result of Defendants' conspiratorial and anti-competitive conduct, Plaintiffs and members of the Classes have paid more for Online Music and CDs than they would have in a market free from Defendants' competitive restraint.

3.      Defendants' conduct violates, *inter alia*, the Sherman Act, state antitrust and unfair competition statutes and state common laws of unjust enrichment. Plaintiffs seek an order enjoining Defendants' anticompetitive conduct and damages for themselves and the Classes as a result of Defendants' unlawful conduct.

**PARTIES**

4.      Plaintiff Dennis Bulcao ("Bulcao") is a resident of the State of California, County of San Diego. Plaintiff Bulcao has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein, Plaintiff Bulcao has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

1    5.    Plaintiff Alexander Justis Clark ("Clark") is a resident of the State of California, County of San Diego. Plaintiff Clark has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein, Plaintiff Clark has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

6.    Plaintiff Matt Putman ("Putman") is a resident of the State of California, County of San Diego. Plaintiff Putman has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein, Plaintiff Putman has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

7.    Plaintiff George Creamer ("Creamer") is a resident of the State of California, County of Los Angeles. Plaintiff George Creamer has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein, Plaintiff George Creamer has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

8.    Plaintiff McKenna Creamer ("M. Creamer") is a resident of the State of California, County of Los Angeles. Plaintiff M. Creamer has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein, Plaintiff M. Creamer has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

9.    Plaintiff P. Evan Stephens ("Stephens") is a resident of the State of California, County of San Luis Obispo. Plaintiff Stephens has purchased numerous CDs, as well as Online Music, produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged

1   herein, Plaintiff Stephens has suffered injury in fact and paid artificially inflated prices for CDs and
2   Online Music.

3          10.     Plaintiff Kim Hanson ("Hanson") is a resident of the State of Iowa, County of
4   Dickinson.  Plaintiff Hanson has purchased numerous CDs, as well as Online Music, produced,
5   licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the
6   filing of this Complaint.  As a result of Defendants' unlawful conduct alleged herein, Plaintiff
7   Hanson has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

8          11.     Plaintiff James Miller ("Miller") is a resident of the State of Texas, County of Travis.
9   Plaintiff Miller has purchased numerous CDs, as well as Online Music, produced, licensed,
10  distributed and/or sold by one or more of the Defendants, in the four years preceding the filing of
11  this Complaint.  As a result of Defendants' unlawful conduct alleged herein, Plaintiff Miller has
12  suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

13         12.     Plaintiff Wayne Gilbert ("Gilbert") is a resident of the State of California, County of
14  Santa Maria.  Plaintiff Gilbert has purchased numerous CDs, as well as Online Music, produced,
15  licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the
16  filing of this Complaint.  As a result of Defendants' unlawful conduct alleged herein, Plaintiff
17  Gilbert has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

18         13.     Plaintiff Elise R. DeVore ("DeVore") is a resident of the State of Massachusetts,
19  County of Sulfolk.  Plaintiff DeVore has purchased numerous CDs, as well as Online Music,
20  produced, licensed, distributed and/or sold by one or more of the Defendants, in the four years
21  preceding the filing of this Complaint. As a result of Defendants' unlawful conduct alleged herein,
22  Plaintiff DeVore has suffered injury in fact and paid artificially inflated prices for CDs and Online
23  Music.

24         14.     Plaintiff Mitchell L. Horton ("Horton") is a resident of the State of New Mexico,
25  County of Curry.  Plaintiff Horton has purchased numerous CDs, as well as Online Music, produced,
26  licensed, distributed and/or sold by one or more of the Defendants, in the four years preceding the
27  filing of this Complaint.  As a result of Defendants' unlawful conduct alleged herein, Plaintiff
28  Horton has suffered injury in fact and paid artificially inflated prices for CDs and Online Music.

15. Plaintiffs Bulcao, Clark, Putman, Creamer, M. Creamer, Stephens, Hanson, Miller, Gilbert, DeVore and Horton are collectively referred to as Plaintiffs.

16. Defendant Sony BMG Music Entertainment ("Sony BMG"), is a Delaware general partnership, with its principal place of business in New York and a corporate office in Santa Monica, California. Defendant Sony BMG was formed as a joint venture of Defendant Sony Corporation and Bertelsmann AG to operate their merged music operations. In or about August 2004, Defendants Sony and Bertelsmann merged their U.S. music operations and purportedly transferred their respective musical copyrights, licensing agreements and royalty rights to Defendant Sony BMG, which is organized under the laws of New York. Defendant Sony BMG maintains its principal headquarters in New York City. As a result of its formation, Sony BMG now owns and controls music released under such record labels as Arista, Columbia, Epic, and RCA Records. Defendant Sony BMG produces, licenses and distributes Online Music and CDs through a wide variety of retailers, some of whom are owned and/or controlled by Defendant Sony BMG or their corporate parents, Defendants Sony and Bertelsmann.

17. Defendant Sony Corporation of America ("Sony"), is a New York corporation with its principal place of business in New York, and is the U.S. subsidiary of Sony Corporation, which is based in Tokyo, Japan. In addition to its music operations and large electronics business, Sony also owns Sony Pictures Entertainment, Columbia TriStar Pictures, and Sony Playstation.

18. Defendant Bertelsmann, Inc. ("Bertelsmann"), is a Delaware corporation with its principal place of business in New York, and is the U.S. subsidiary of Bertelsmann AG, whose headquarters is in Gütersloh, Germany. Bertelsmann AG also owns dozens of radio and television stations in Europe; major book publishers including Random House, Bantam-Dell, Crown, Fodor's, Ballantine, Doubleday, and Knopf; the Columbia House CD club; and major magazines such as Family Circle, Parents, and YM.

19. Defendant Universal Music Group ("UMG"), is a Delaware corporation with its headquarters in Santa Monica, California. Defendant UMG is a subsidiary of Vivendi Universal S.A., headquartered in Paris, France. Vivendi is a conglomerate that in addition to its music business, owns many of the leading media and telecommunication companies in Europe and Africa

1  and is also one of the world's largest video game developers. UMG owns and controls music sold

2  under such record labels as Mercury, Interscope, Geffen, A&M, Island Def Jam, Philips and Polydor

3  Records. Defendant UMG produces, licenses and distributes Online Music and CDs through a wide

4  variety of retailers, some of whom are owned and/or controlled by Defendant UMG.

5      20.    Defendant Warner Music Group Corp. ("Warner"), is a Delaware corporation with its

6  principal corporate headquarters located in New York City. Warner owns and controls music

7  released under such record labels as Warner Bros., Asylum, Bad Boy, We Put Out, Reprise, Sire,

8  Atlantic, Elektra, and London Records. Defendant Warner produces, licenses and distributes Online

9  Music and CDs through a wide variety of retailers, some of whom are owned and/or controlled by

10  Defendant Warner or its corporate parent Time Warner.

11      21.    Defendant Time Warner, Inc. ("Time Warner"), is the largest media conglomerate in

12  the world, with its headquarters in New York City. In addition to Warner Music Group Corp., it

13  owns America Online ("AOL"), HBO, CNN, Court TV, TBS, TNT, the WB Network, Turner

14  Classic Movies, Cartoon Network, Time Warner Cable, Road Runner Hi-Speed Internet,

15  Kablevision, New Line Cinema, Warner Brothers Studios, Castle Rock Entertainment, Hanna-

16  Barbera, Warner Books, Time Life, Little Brown, Sports Illustrated, Fortune, Money, People,

17  Entertainment Weekly, Southern Living, Field & Stream, Golf Magazine, DC Comics, America

18  Online, CompuServe, Netscape, MapQuest, Warner Brothers Theme Parks, and the Atlanta Braves.

19      22.    Defendant EMI Group, PLC ("EMI"), is headquartered in London. EMI operates in

20  over 25 countries, and operates in the United States through wholly owned subsidiaries including

21  EMI Group North America, Inc., a Delaware corporation. At various times, Defendant EMI has

22  signed and released music from The Beatles, The Beach Boys, The Byrds, The Hollies, and Pink

23  Floyd. Defendant EMI owns and controls music released under such record labels as Apple, Blue

24  Note, Capitol, Chrysalis and Virgin Records. Its largest United States operation is Capitol Records,

25  a Delaware corporation headquartered in Los Angeles. Its other major subsidiaries in the United

26  States are Astralwerks, Caroline Distribution, EMI Christian Music Group, EMI CMG Distribution,

27  EMI Gospel, EMI Latin, EMI Music Publishing Nashville and Virgin Records. Defendant EMI

28

1  produces, licenses and distributes Online Music and CDs through a wide variety of retailers at least

2  one of whom is owned and/or controlled by Defendant EMI.

3      23.    Defendants Sony BMG, Sony, BMG, UMG, Time Warner, Warner and EMI are

4  collectively referred to herein as "Defendants." UMG, Sony BMG, EMI, and Warner are

5  collectively referred to herein as "Defendant Labels." Defendants, directly or through a division,

6  parent, subsidiary or agent, have had actual knowledge of, and have knowingly participated in, the

7  conspiracy to fix the prices for Online Music and CDs, including the restraint of the availability and

8  distribution of Online Music.

9      24.    The acts charged in this Complaint to have been done by Defendants were authorized,

10  ordered, and done by its officers, employees, agents, members or representatives while actively

11  engaged in the management, direction, control or transaction of the business or affairs of each of the

12  Defendants.

13                    **UNNAMED CO-CONSPIRATORS**

14      25.    Co-conspirator Recording Industry Association of America ("the RIAA") is a trade

15  organization claiming to represent companies that "create, manufacture and/or distribute

16  approximately 90% of all legitimate sound recordings produced and sold in the United States." It is

17  located at 1330 Connecticut Avenue, NW, Suite 300, Washington, DC 20036. The RIAA lobbies on

18  behalf the industry and frequently represents its members in litigation. All Defendant Labels are

19  members of the RIAA, directly or through their subsidiaries, and Defendant Labels have control over

20  the organization by providing a majority of its budget and nominating the majority of its board of

21  directors. RIAA has conspired with Defendants and participated in the illegal activities described

22  herein. The self-described function of the RIAA "is to foster a business and legal climate that

23  supports and promotes our members' creative and financial vitality." In fact, RIAA provides

24  Defendants with a forum to exchange competitive information and to coordinate their scheme to

25  restrain the availability and commercial development of Online Music.

26      26.    Various other persons, firms, corporations, or joint ventures not named defendants in

27  this lawsuit, the identities of which are presently unknown, may have participated as co-conspirators

28

1  with each of the Defendants' illegal activities in this Complaint and have performed acts and made

2  statements in furtherance of the illegal combination and conspiracy.

3  **JURISDICTION AND VENUE**

4      27.     Jurisdiction is conferred upon this judicial district pursuant to §§4 and 16 of the

5  Clayton Act, 15 U.S.C. §§15 and 26, and 28 U.S.C. §§1331 and 1337.

6      28.     This Court also has diversity jurisdiction over the Classes pursuant to 28 U.S.C.

7  §§1332(d)(2) and (6) of the Class Action Fairness Act of 2005 because one or more members of the

8  Classes defined herein are citizens of a State different from one or more Defendants and the

9  aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and

10  costs.

11      29.     Venue is proper in this district pursuant to §§4, 12 and 16 of the Clayton Act, 15

12  U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391 because Defendants transact business in this district,

13  and because thousands of Class members are located in this district. Additionally, a substantial part

14  of the interstate trade and commerce involved and affected by the alleged violations of the antitrust

15  laws was and is carried on in part within this district. The acts complained of have had, and will

16  have, substantial anticompetitive effects in this district. One of the Plaintiffs resides in this district.

17  Finally, at least one other case is pending in this district concerning the subject matter alleged herein.

18  **TRADE AND COMMERCE**

19      30.     During the Class Period, each of the Defendants, itself or through their affiliates,

20  agents or subsidiaries, produced, licensed, distributed and/or sold Online Music and CDs in a

21  continuous and uninterrupted flow of intrastate and interstate commerce throughout the United

22  States.

23  **RELEVANT MARKET**

24      31.     As to claims so requiring, the relevant product markets for purposes of this action are

25  the market for Online Music and the market for CDs. The relevant geographic market is the United

26  States.

27      32.     Defendant Labels are the four largest music labels and control in excess of 85% of the

28  market for all Online Music sold in the United States and in excess of 85% of the market for all CDs

1  sold in the United States. Defendant Labels function as an oligopoly. Jointly they exercise market

2  power over and dominate the market for Online Music and the market for CDs.

### FACTUAL BACKGROUND OF DEFENDANTS' ANTICOMPETITIVE CONDUCT

33.     Defendant Labels produce, license and distribute Online Music and CDs to retailers

for sale throughout the United States and in some instances sell Online Music and CDs directly to

consumers through Internet sites, record clubs and other entities which they own or control. For

example, Defendants Bertelsmann, EMI, Sony, and Time Warner sold music directly to consumers

over the Internet through their Music.net joint venture. Defendants Sony and UMG sold Online

Music directly to consumers through their joint venture pressplay. Defendant Sony sells Online

Music directly to consumers using its online store Sony Connect. Defendant Sony BMG sells CDs

to consumers directly on Sony Music Store and other channels. Defendant UMG, through Universal

Music Store, sells CDs directly to consumers. Defendant BMG sells music directly to consumers

through its BMG Music Club service. In 2005, Defendant BMG's parent Bertelsmann AG acquired

Columbia House, BMG Music Club's only large competitor in the United States, through which it

sells CDs directly to consumers. Defendant Time Warner sells Online Music to consumers on its

online store AOL Music Now. Defendant Time Warner sells CDs directly to consumers using AOL

Music and through other channels.

34.     The music industry and the markets for Online Music and CDs have been changing

rapidly in recent years due to technological advances and consumer preferences. Transmitting music

electronically to consumers via the Internet has worked a revolutionary change to the business model

of Defendant Labels by exponentially increasing the speed and amount of music that can be

distributed while dramatically reducing costs associated with music production, distribution and sale

through the now traditional medium of CDs. Pricing for CDs accounts for costs such as producing a

master disc; producing copies of the disc; the CD case; artwork; label, branding and anti-shoplifting

packaging; importing the CDs into the United States; shipping CDs to distribution warehouses and

then to record stores; labor to unpack and shelve the CDs and man the cash registers; and returning

1   and/or destroying unsold inventory. All of these costs are eliminated when music is distributed

2   online.

3        35.    In addition to being far cheaper and instantaneous, online distribution of music

4   benefits the consumer, who does not have to drive to a store, does not have to worry about care and

5   storage of the CD, and can instantly store the purchased music onto a computer or portable music

6   device such as Apple's iPod or an MP3 player. Indeed, for many consumers, Online Music is the

7   proverbial "better mousetrap." Online Music is imminently portable, allows consumers to choose

8   and purchase only those selections they desire instead of entire CDs, and allows consumers to load

9   enormous audio libraries that not long ago would have required an entire room to house into their

10  portable music devices. But for Defendants' anticompetitive conduct, Online Music would be

11  dramatically less expensive than CDs.

12       36.    The underlying Online Music technology (the ability to collect payment and to

13  transmit music digitally over the Internet) has been available at least as early as 1994. In a

14  competitive market, lower costs and strong demand for these improved technologies would have

15  created a larger market for low-cost Online Music years earlier as consumers switched from CDs to

16  purchasing Online Music *en masse*, much as they switched from cassette tapes to CDs a generation

17  earlier. This change-over has not happened yet because Defendants have used their near-complete

18  monopoly over music licensing to stifle the growth and efficiencies of the Online Music market. For

19  example, in 1998, Defendants, acting through their trade organization and co-conspirator, the RIAA,

20  sued to enjoin the importation or sale in the United States of the Diamond Rio portable music player,

21  the direct forerunner of the enormously popular Apple iPod. This lawsuit proved unsuccessful, and

22  as the technology of portable music players improved, demand increased.

23       37.    The distribution of digital music exploded in the late 1990s with the emergence of

24  Napster, the most popular online music service (which had tens of millions of users), Kazaa and

25  other services offering free peer to peer file sharing, *i.e.*, the ability of one person to share Online

26  Music with anyone else via a website. These services demonstrated the viability of distributing

27  music online. Although Napster initially provided file sharing for free, ultimately it attempted to

28  negotiate with the Defendants to charge for Online Music. Defendants rejected offers by Napster to

1   license their music catalogues for sale online.  Defendants' concerted refusal to deal with Napster

2   thus eventually forced the most promising and popular Online Music service into bankruptcy.  The

3   Napster brand has since been resurrected and Defendants Sony and UMG are minority shareholders

4   in the venture.

5   　　　　38.　　During the summer of 2001, and while Defendants were successfully shutting down

6   Napster, Defendants formed two joint ventures to sell Online Music: MusicNet and pressplay.  At

7   the time, MusicNet was owned by BMG, Warner and EMI, while UMG and Sony owned pressplay.

8   These were not serious commercial ventures, but rather attempts to occupy the market with

9   frustrating and ineffectual services in order to head off viable Online Music competitors from

10  forming and gaining popularity after Napster's demise.  Defendants placed so many onerous

11  restrictions on the music files once they were downloaded that one prominent computer industry

12  magazine noted that "nobody in their right mind will want to use" the services.[1]  For example,

13  pressplay allowed only 10 songs to be burned to a CD per month, and no more than two of them

14  could be by the same artist.  On MusicNet, downloaded songs would expire every 30 days and had to

15  be downloaded again and again each month, and customers were forced to download software that

16  would "take over their computers" by automatically changing default settings and placing desktop

17  and other shortcuts, to name a few of the software's unwanted features.  Neither service allowed

18  music to be played on the Apple iPod, the most popular portable music player, nor did either service

19  make Defendants' whole catalog available for download.  Even the songs that were available for

20  download on MusicNet and pressplay were in a below-CD quality audio format despite the wide

21  availability of technology which would have cured this substantial defect.  Predictably, neither

22  MusicNet nor pressplay had success with consumers.

23  　　　　39.　　Nonetheless, as of mid-2001 Defendants continued to hold firm to their concerted

24  decision not to license any Online Music services to provide their music catalogues for sale to

25  consumers.  This refusal to grant meaningful licenses to an entity which Defendants did not own or

26  _____

27  [1]　　PC World, Digital Music: Worth Buying Yet?, 1/18/02.

28

1   control delayed and retarded the eventual growth of the Online Music market. Defendants sought to

2   forestall and then distort the development of the Online Music market because it would decrease

3   Defendants' CD sales and their considerable profit margins on CDs.

4        40.    Not only were MusicNet and pressplay inferior to Napster and other services, but

5   Defendants imposed anti-competitive conditions upon Online Music services that licensed music via

6   MusicNet. The pricing structure of the contract was such that the licensee would have to pay

7   penalties in the form of higher prices for Defendants' music if the licensee licensed music from any

8   company other than MusicNet. This not only restrained trade in the Online Music business, but also

9   prevented the small independent labels that competed with Defendants from obtaining access to

10  online outlets.

11       41.    Defendants were paid shares of the total revenue generated by a joint venture licensee

12  rather than receive money on a per song basis. Because each Defendant Labels' financial interest in

13  the joint ventures was therefore linked to the total sales of all the labels rather than its own market

14  share, Defendant Labels had no incentive to compete with one another.

15       42.    The financial structure of the joint ventures encouraged Defendant Labels to engage

16  in cartel behavior rather than competition. Defendants are no strangers to lawsuits and government

17  investigations for anticompetitive behavior related to sales of recorded music. Beginning in the mid-

18  1990's, discount retailers such as Target and Circuit city entered the CD market, offering discounts

19  and gaining market share from traditional music retailers, threatening "the high and stable profit

20  margins for CDs."[2] Defendants were sued by numerous State Attorneys General's private plaintiffs

21  for allegedly agreeing to impose minimum advertised price policies that harshly penalized retailers

22  for selling below the price set by the record labels. Defendants settled the suit in 2003 against them

23  for this illegal anticompetitive behavior for $140 million and an injunction against further minimum

24  advertised price policies.

25

26

27  [2]    Plaintiff States' Third Amended Complaint, *Florida, et al. v. BMG Music, et al.*, Docket
     No. 2:01-CV 84-P-H.

28

43.     In another example of recent anticompetitive behavior, the Attorney General of New York and the Federal Communications Commission are further investigating Defendants for their "payola" schemes of paying radio stations for playing certain songs, an illegal practice that locks out new artists and smaller record companies. Sony BMG and Warner have settled with the New York Attorney General, while the case against the rest of the Defendants is ongoing.

44.     The MusicNet and pressplay joint ventures also provided Defendants with opportunities and forums to meet and further conspire to cooperate to maintain the prices of all their music products. In antitrust cases brought by the creditors of the bankrupt Napster against the record labels, the Court wrote, "even a naïf must realize that in forming and operating a joint venture, [record label] representatives must necessarily meet and discuss pricing and licensing . . . [t]hese joint ventures bear the indicia of entities designed to allow [record labels] to use their copyrights and extensive market-power to dominate the market for digital music distribution. Even on the undeveloped record before the court, these joint ventures look bad, sound bad and smell bad."[3] The joint venture provided the vehicles through which Defendants attempted to control the emergence and growth of Online Music in order to protect their sales of and margins on CDs.

45.     It was not until the phenomenal success of Apple's iPod portable music players and the creation of Apple's iTunes Music Service in 2003 that Defendants finally relented and allowed their music to be licensed for online distribution in a form not crippled by heavy restrictions or distributed by one of their collusive joint ventures. Thus, widespread distribution of Online Music through iTunes, to be played on iPods, occurred more than eight years after the underlying technology became widely available.

46.     In sum, Defendants' concerted refusals to deal with Napster and to authorize an independent Online Music entity to distribute and sell downloads were designed to maintain the sales volume, pricing and profits they obtained through CDs. Defendants sought to delay the Online Music market through their joint ventures and, when they could not hold back market forces any

---

[3]     *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1109 (N.D. Cal. 2002) (internal citations omitted).

1  longer, they conspired to set the wholesale price of Online Music at supracompetitive levels to

2  protect the CD market.

3       47.    Defendants have continued to nakedly restrain trade in the market for Online Music

4  by engaging in price fixing. When Defendants first entered the market with their joint ventures, they

5  charged as little as $10 for 50 songs, or 20 cents per song. Defendants have now agreed to a

6  wholesale price floor at which they sell Online Music to retailers at or about 70 cents per song.

7  Further restraining competition in the Online Music market, Defendants use their market power to

8  coerce Online Music retailers to sign "most favored nation" agreements that specify that the retailers

9  must pay each of the Defendant Labels the same amount. By setting a wholesale price floor at 70

10 cents per song, Defendants have fixed and maintained the price of Online Music at supracompetitive

11 levels. Additionally, virtually all songs were licensed by Defendant Labels at the exact same price

12 without regard to the artist, its popularity, its length or vintage. Now Defendants are collectively

13 pressuring Apple to raise its price above the current 99 cents per song. By comparison, an online

14 music service that serves the much smaller independent or "indie label" market, eMusic, charges $10

15 for each 40 songs, or 25 cents per song.

16      48.    Defendants' price fixing of Online Music is also the subject of a pending

17 investigation by New York State Attorney General Eliot Spitzer who subpoenaed Defendants for

18 information on the wholesale prices they charge for Online Music. On March 3, 2006, the United

19 States Department of Justice opened an investigation into collusion and price fixing of Online Music

20 by the Defendant Labels. The Defendant Labels either have received or will soon receive formal

21 "civil investigative demands," which are similar to subpoenas.

22      49.    A primary motive for Defendants' suppression of trade in the Online Music market

23 was to protect their investment in the CD market and allow them to maintain their enormous profits

24 until they transitioned from highly profitable CDs to Online Music. The advantages of Online Music

25 distribution, unless the price is fixed at the appropriate price, threaten this investment in three ways.

26 First, there is only a limited amount of shelf space in record stores and Defendants use their market

27 power to crowd out all but the most popular CDs produced and distributed by smaller competing

28 labels. Online Music sites, by contrast, can offer an unlimited amount of music, giving consumers

1    more access to the catalogues, artists and songs of Defendant Labels' competitors. The emerging

2    Online Music market is a threat to Defendants' oligopoly. Second, the Online Music market allows

3    consumers to choose and only pay for the songs they want, rather than being forced to buy an entire

4    CD mostly full of what they perceive as "filler." Third, Online Music threatens Defendants' practice

5    of bundling content. Bundling allows Defendants to engage in price discrimination against

6    consumers with different preferences. Even if some consumers do not perceive the additional songs

7    on each CD to be worthless filler, they still accord them different values. For example, if A is

8    willing to pay $3 for song one and $2 for song two, and B has the opposite preference, the vendor's

9    maximum revenue would be $8 if they were sold separately, because it is not able to charge more

10   than $2 each and still make four sales. However, if the two songs were bundled together and sold for

11   $5, the company would have revenue of $10.

12          50.     Before Online Music, selling songs together was the only practical way to sell music.

13   Few people would want to eject a CD from a CD player and put in a new one at the end of every

14   song, and material and packaging prices made selling music by individual song even more

15   impractical. When purchasing Online Music, consumers now have the choice of purchasing entire

16   albums or individual songs. Enormously popular iPods and MP3 players allow consumers to group

17   individual songs by artist, genre, play lists, album name or otherwise together according to their own

18   personal preferences. The new and expanding Online Music market demonstrates that the vast

19   majority of consumers prefer to purchase individual songs. This preference was not lost on

20   Defendants, who quickly realized that failure to price Online Music, where consumers could

21   purchase a single song instead of an entire album, at less than supracompetitive levels would

22   seriously erode the CD market and Defendants' profits.

23          51.     By conspiring to restrain the growth of Online Music and to set a price floor for

24   Online Music at supracompetitive levels, Defendants have protected their ability to maintain sales of

25   CDs at prices higher than they would be but for Defendants' anticompetitive conduct.

26

27

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW                          - 14 -

## CLASS ACTION ALLEGATIONS

52.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following Classes:

**Injunctive Relief Class**

53.    All persons or entities in the United States (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchase Online Music produced, manufactured, licensed, distributed and/or sold by Defendants.

**End Purchaser Online Music Damages Class**

54.    All persons or entities in the United States (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchased Online Music produced, manufactured, distributed and/or sold by Defendants from March 7, 2002 through the conclusion of the trial of this matter ("Class Period"), other than those who purchased Online Music directly from Defendants or an entity owned or controlled by Defendants.

**End Purchaser CD Damages Class**

55.    All persons or entities in the United States (excluding federal, state and local governmental entities, Defendants, their directors, officers and members of their families) that purchased CDs produced, manufactured, distributed and/or sold by Defendants during the Class Period, other than those who purchased CDs directly from Defendants or an entity owned or controlled by Defendants.

56.    Excluded from each of the Classes are Defendants, there directors, officers and members of their families; any entity which any Defendant owns, controls or has controlling interest; the affiliates, legal representatives, attorneys, heirs or assigns of any Defendant; and any federal, state or local governmental entity.

57.    The Classes are so numerous that joinder of all members is impracticable. There are thousands of members in the Classes who are geographically dispersed throughout the United States and Indirect Purchaser States.

58. Plaintiffs' claims are typical of the claims of the members of the Classes because Plaintiffs and all Class members were damaged by the same wrongful conduct of the Defendants alleged herein.

59. There are questions of law and fact common to the Classes which predominate over any questions affecting only individual Class members. Such common questions include:

(a) Whether the Defendants violated the Sherman Act and relevant Indirect Purchaser State antitrust statutes by engaging in a continuing combination and conspiracy to: restrain the availability and distribution of Online Music and fix and maintain the prices for Online Music and CDs;

(b) The duration and extent of any such combination or conspiracy alleged;

(c) Whether the Defendants and each of them were participants in any such combination or conspiracy alleged herein;

(d) Whether Defendants fixed the price of Online Music at supracompetitive levels;

(e) Whether Defendants fixed the price of CDs at supracompetitive levels; and

(f) Whether Defendants' conduct caused damage to Plaintiffs and members of the Classes, and if so, the appropriate measure of such damages.

60. The claims of the Plaintiffs are typical of the claims of the Classes, and Plaintiffs have no interest adverse to the interest of other members of the Classes.

61. Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel experienced and competent in the prosecution of complex class actions and antitrust litigation.

62. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford to individually litigate an antitrust claim against large corporate Defendants. There are no

1 difficulties likely to be encountered in the management of this class action that would preclude its

2 maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication

3 of the controversy.

4   63. Defendants have acted on grounds generally applicable to the entire Class, thereby

5 making final injunctive relief or corresponding declaratory relief appropriate with respect to the

6 Class as a whole.

7

**COUNT I**

8

**For Violation of Section 1 of the Sherman Act**
**(On Behalf of All Classes)**

9

10   64. Plaintiffs reallege and incorporate by reference each and every allegation set forth

11 above. This Count is brought pursuant to 15 U.S.C. §1 and 15 U.S.C. §16, for injunctive relief as to

12 all Classes.

13   65. The record music industry is dominated by four entities — Defendant Labels EMI,

14 Sony-BMG, UMG and Warner — which collectively function as a highly concentrated, tightly-knit

15 oligopoly. Together, Defendant Labels account for over 85% of music sold to end purchasers in the

16 United States. The relatively few firms and their market-share stability over time have created an

17 industry environment which enables and facilitates Defendants' ability to coordinate their pricing

18 and other related practices. This market-share stability is inconsistent with an industry that has been

19 subject to sweeping advancements in technology and changes in public taste and fashion for music

20 and the vehicles and media through which music is distributed and sold.

21   66. The recorded-music industry is also characterized by high barriers to entry by new

22 firms, thus further enhancing Defendants' significant market power. The high degree of

23 concentration in the industry and the significant barriers to entry have insulated Defendants from

24 price competition from new entrants to the market.

25   67. Beginning at least as early as March 7, 2002, the exact date being unknown to

26 Plaintiffs, and continuing to the present, Defendants and their co-conspirators have engaged in a

27 continuing combination, conspiracy, and common course of conduct in unreasonable restraint of

28 interstate trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1. As more fully

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW   - 17 -

1  described herein, the combination, conspiracy and common course of conduct engaged in by

2  defendants consisted of a continuing agreement, understanding and concert of action among the

3  Defendants and their co-conspirators, the substantial terms of which were to restrain the availability

4  and distribution of Online Music and then to fix and maintain at artificially high and non-competitive

5  levels the prices at which they sold Online Music. By restraining trade in and fixing the price of

6  Online Music, Defendants were able to further their scheme to protect the market for sales of CDs

7  and maintain at artificially high and non-competitive levels the prices at which they sold CDs. As a

8  result of their conspiracy, combination and common course of conduct, and despite declining costs

9  of production associated with the introduction of new technologies, Defendants have maintained the

10  prices of Online Music and CDs at supracompetitive levels.

11      68.     Pursuant to their combination, conspiracy and concerted action, Defendants have

12  adopted and adhered to virtually identical and parallel methods of distribution (including the use of

13  contracts with substantially identical material terms) and pricing (including the use of lockstep,

14  identical pricing for virtually every song in their catalogues for Online Music). Defendants are the

15  pivotal and controlling link between the artistic production of the recorded-music product on the one

16  hand, and the marketing and distribution of that product on the other. Defendants distribute recorded

17  music throughout the United States, including recordings produced under Defendants' own labels as

18  well as recordings produced by certain independent music companies.

19      69.     Currently Defendants sell Online Music to retailers and distributors at or about 70

20  cents per song despite improvements in technology of the distribution of Online Music and cost

21  savings with producing CDs, and exponentially increased sales volume that have dramatically

22  reduced marginal costs. Defendants have priced Online Music at supracompetitive levels to protect

23  the market, sales volume, and prices for CDs. Were Defendants to sell Online Music at or

24  approaching competitive pricing levels, sales for CDs would decrease dramatically without

25  concomitant price reductions. In consequence, Defendants' conspiracy to restrain the availability

26  and distribution of Online Music, and to fix and maintain the price of Online Music, enables

27  Defendants to maintain CD prices at supracompetitive levels.

28

70.     During the Class Period, each Defendant took actions to restrain the availability and distribution of Online Music. Once it became clear that they could not stem the tide of technological advance, Defendants adopted, at or about the same time, identical terms of sale and pricing schemes for Online Music. Pursuant to their combination, conspiracy and concerted action, Defendants have consistently adopted and adhered to coordinated parallel-pricing schemes.

71.     Defendants' current business practices are also the subject of pending investigations by New York State Attorney General Eliot Spitzer, who subpoenaed Defendants for information on the wholesale prices they charge for Online Music and the Department of Justice, which has also demanded information of Defendants.

72.     Defendants have and continue to use trade associations, including the RIAA, and meetings to restrain and control the sale of Online Music and to plan strategy and communicate pricing. During meetings of the recording industry, Defendants discussed how to put Napster out of business and reign in similar threats by distributors of Online Music to their pricing and distribution oligopoly. At a recent meeting, Defendants openly discussed adopting a variable online price scheme (*i.e.*, to charge more for certain singles and less for others).

73.     Each of the Defendants has engaged in one or more overt acts in furtherance of the contract, combination and/or conspiracy alleged. In consequence, the aforesaid combination and conspiracy had the following effects, among others:

(a)     Plaintiffs and other members of the Classes were deprived of the benefits of free and open competition in the purchase of Defendants' Online Music and CDs;

(b)     Defendants' Online Music prices were raised, fixed and maintained at artificially high and non-competitive levels;

(c)     Defendants' CD prices were maintained at artificially high and non-competitive levels;

(d)     Plaintiffs and other members of the Classes were forced to pay artificially high, non-competitive prices for Online Music and CDs; and

(e)     Price competition among Defendants in the sale of Online Music, and as a direct consequence in the sale of CDs, was restrained, suppressed and eliminated.

74.     During the time period covered by this Complaint, Plaintiffs and other members of the Classes purchased substantial quantities of Online Music and CDs sold by Defendants. By reason of the violations of §1 of the Sherman Act, Plaintiffs and other members of the Classes paid more for Online Music and CDs than they would have in the absence of the illegal combination, conspiracy and common course of conduct and, as a result, have been injured in their business and property and have suffered damages in an amount currently undetermined.

75.     Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

## COUNT II

### For Violation of State Antitrust and Unfair Deceptive Acts and Practice Statutes
### (On Behalf of End Purchaser Online Music and CD Damages Classes)

76.     Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

77.     This Count is alleged against all Defendants on behalf of the End Purchaser Online Music and CD Damages Classes. Defendants' conduct as alleged herein violates the antitrust and unfair and deceptive acts and practices laws of each of the following jurisdictions:

(a)     **Alaska:** The aforementioned practices by Defendants were and are in violation of Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §45.50.471, *et seq.*;

(b)     **Arizona:** The aforementioned practices by Defendants were and are in violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §44-1401, *et seq.*; and the Constitution of the State of Arizona, Article 14, §15;

(c)     **Arkansas:** The aforementioned practices by Defendants were and are in violation of Ark. Code §4-88-101, *et seq.*;

(d)     **California:** The aforementioned practices by Defendants were and are in violation of the Cartwright Act, California Business and Professions Code §16700, *et seq.*; and the Unfair Competition Law, California Business and Professions Code §17200, *et seq.*;

(e)     **Colorado:** The aforementioned practices by Defendants were and are in violation of the Colorado Consumer Protection Act, C.R.S. 6-1-101, *et seq.*;

1       (f) **Connecticut:** The aforementioned practices by Defendants were and are in

2    violation of Conn. Gen. Stat. §42-110b, *et seq.*;

3       (g) **Delaware:** The aforementioned practices by Defendants were and are in

4    violation of the Consumer Fraud Act, 6 Del. C. §§2511, *et seq.*; and the Deceptive Trade Practices

5    Act, 6 Del. C. §2531, *et seq.*;

6       (h) **District of Columbia:** The aforementioned practices by Defendants were and

7    are in violation of the District of Columbia Antitrust Act, D.C. Code §28-4501, *et seq.*; and the

8    District of Columbia Consumer Protection Act, D.C. Code 28-3901, *et seq.*;

9       (i) **Florida:** The aforementioned practices by Defendants were and are in

10   violation of the Florida Deceptive and Unfair Trade Practices Act, §501.201, *et seq.*;

11      (j) **Georgia:** The aforementioned practices by Defendants were and are in

12   violation of the Georgia Fair Business Practices Act, O.C.G.A. §10-1-390, *et seq.*;

13      (k) **Hawaii:** The aforementioned practices by Defendants were and are in

14   violation of the Hawaii antitrust statute, HRS §480-1, *et seq.*; and the Unfair Practices Act, HRS

15   §481-1, *et seq.*;

16      (l) **Idaho:** The aforementioned practices by Defendants were and are in violation

17   of the Consumer Protection Act, Idaho Code §48-601, *et seq.*;

18      (m) **Illinois:** The aforementioned practices by Defendants were and are in

19   violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1; Uniform

20   Deceptive Trade Practices Act, 815 ILCS 510/1; and the Illinois Antitrust Act, 740 ILCS 10/1;

21      (n) **Iowa:** The aforementioned practices by Defendants were and are in violation

22   of the Iowa Competition Law, Iowa Code §553.1, *et seq.*; and Iowa Consumer Fraud Act, Iowa Code

23   §714.16;

24      (o) **Kansas:** The aforementioned practices by Defendants were and are in

25   violation of the Kansas Unfair Trade and Consumer Protection Act, K.S.A. §50-101, *et seq.*;

26      (p) **Kentucky:** The aforementioned practices by Defendants were and are in

27   violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §367.110, *et seq.*;

28

1      (q)    **Maine:** The aforementioned practices by Defendants were and are in violation

2  of the Maine Trade Regulation Law of 1954, 10 M.R.S.A. §1101, *et seq.*, and the Maine Unfair

3  Trade Practices Act, 5 M.R.S.A., §205-A, *et seq.*;

4      (r)    **Maryland:** The aforementioned practices by Defendants were and are in

5  violation of the Consumer Protection Act, Md. Com. Law Code §13-101, *et seq.*;

6      (s)    **Massachusetts:** The aforementioned practices by Defendants were and are in

7  violation of the Massachusetts Consumer Protection Act, M.G.L. Ch. 93A, *et seq.*;

8      (t)    **Michigan:** The aforementioned practices by Defendants were and are in

9  violation of the Michigan Antitrust Reform Act, MCL §445.772, *et seq.*;

10      (u)    **Minnesota:** The aforementioned practices by Defendants were and are in

11  violation of the Minnesota Antitrust Act of 1971, Minn. Stat. §325D.49, *et seq.*; and Minnesota

12  Prevention of Consumer Fraud Act, Minn. Stat. §325F.69;

13      (v)    **Missouri:** The aforementioned practices by Defendants were and are in

14  violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §407.010, *et seq.*;

15      (w)    **Montana:** The aforementioned practices by Defendants were and are in

16  violation of the Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-

17  101, *et seq.*;

18      (x)    **Nebraska:** The aforementioned practices by Defendants were and are in

19  violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. §59-1601, *et seq.*;

20      (y)    **Nevada:** The aforementioned practices by Defendants were and are in

21  violation of the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. §598A.010, *et seq.*;

22      (z)    **New Hampshire:** The aforementioned practices by Defendants were and are

23  in violation of N.H. Rev. Stat. §358-A:1, *et seq.*;

24      (aa)    **New Jersey:** The aforementioned practices by Defendants were and are in

25  violation of the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1, *et seq.*;

26      (bb)    **New Mexico:** The aforementioned practices by Defendants were and are in

27  violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §57-1-1, *et seq.*; and the New Mexico

28  Unfair Practices Act, N.M. Stat. Ann. §57-12-3;

1        (cc)    **New York:** The aforementioned practices by Defendants were and are in

2  violation of the New York Donnelly Act, Gen. Bus. Law §349, *et seq.*; and/or New York General

3  Business Law §349;

4        (dd)    **North Carolina:** The aforementioned practices by Defendants were and are in

5  violation of the North Carolina Unfair Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1, *et seq.*;

6        (ee)    **North Dakota:** The aforementioned practices by Defendants were and are in

7  violation of North Dakota's antitrust law, North Dakota Cent. Code §51-08.1, *et seq.*; §51-15-02;

8        (ff)    **Ohio:** The aforementioned practices by Defendants were and are in violation

9  of Ohio Consumer Sales Practices Act §1345.01, *et seq.*;

10        (gg)    **Pennsylvania:** The aforementioned practices by Defendants were and are in

11  violation of the Unfair Trade Practice and Consumer Protection Law, 73 P.S. §201-1, *et seq.*;

12        (hh)    **Puerto Rico:** The aforementioned practices by Defendants were and are in

13  violation of Puerto Rico's antitrust law, 10 LPRA §257, *et seq.*; 32 LPRA §5141;

14        (ii)    **Rhode Island:** The aforementioned practices by Defendants were and are in

15  violation of Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §6-13.1-1, *et seq.*;

16        (jj)    **South Carolina:** The aforementioned practices by Defendants were and are in

17  violation of S.C. Code Laws §39-5-10, *et seq.*;

18        (kk)    **South Dakota:** The aforementioned practices by Defendants were and are in

19  violation of South Dakota's antitrust law, S.D. Codified Laws §37-1-3.1, *et seq.*;

20        (ll)    **Tennessee:** The aforementioned practices by Defendants were and are in

21  violation of the Tennessee Trade Practices Act, Tenn. Code Ann. §47-25-101, *et seq.*; and the

22  Consumer Protection Act of 1977, Tenn. Code Ann. §47-18-101, *et seq.*;

23        (mm)    **Texas:** The aforementioned practices by Defendants were and are in violation

24  of Tex. Bus. & Com. Code §17.41, *et seq.*;

25        (nn)    **Utah:** The aforementioned practices by Defendants were and are in violation

26  of Utah Code §76-10-911, *et seq.*;

27        (oo)    **Vermont:** The aforementioned practices by Defendants were and are in

28  violation of Vermont antitrust law, Vermont Stat. §2451, *et seq.*;

1    (pp)    **Virginia:** The aforementioned practices by Defendants were and are in

2  violation of Va. Code §59.1-198, *et seq.*;

3    (qq)    **Washington:** The aforementioned practices by Defendants were and are in

4  violation of Wash. Rev. Code §19.86.010, *et seq.*;

5    (rr)    **West Virginia:** The aforementioned practices by Defendants were and are in

6  violation of the West Virginia Antitrust Act, Chapter 47, Article 18, §1, *et seq.*, West Virginia

7  Consumer Credit Protection Act, W.Va. Code §46A-1-101, *et seq.*; §47-11A-1, *et seq.*; and

8    (ss)    **Wisconsin:** The aforementioned practices by Defendants were and are in

9  violation of the Wisconsin Antitrust Act, Wis. Stat. §133.01, *et seq.*

10    78.    As a result of Defendants' violations of the aforementioned state laws prohibiting

11  unfair competition, Plaintiff and the Class are entitled to bring this claim and to recover herein

12  compensatory damages, punitive and special damages including but not limited to treble damages,

13  reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

14                                  **COUNT III**

15                        **Unjust Enrichment Under State Law**
   **(On Behalf of End Purchaser Online Music and CD Damages Classes)**
16

17    79.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

18    80.    This Count is alleged against all Defendants, on behalf of the End Purchaser Online

19  Music and CD Damages classes. Defendants have benefited finally from their unlawful and

20  inequitable acts alleged in this Complaint. Defendants' financial benefits resulting from their

21  unlawful and inequitable conduct are traceable to overpayments for Online Music and CDs

22  stemming from Defendants' combination and conspiracy to restrain trade in Online Music and set

23  the prices for Online Music, and for CDs, at supracompetitive levels.

24    81.    The Classes have conferred upon Defendants an economic benefit, in the nature of

25  profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the members

26  of the Classes.

27

28

COMPLAINT FOR VIOLATION OF THE SHERMAN ACT, STATE ANTITRUST & UNFAIR DECEPTIVE ACTS
& PRACTICE STATUTES AND FOR UNJUST ENRICHMENT UNDER STATE LAW                          - 24 -

82. The economic benefit of overcharges and unlawful profits derived by Defendants through charging supracompetitive and artificially inflated prices for Online Music and CDs is a direct and proximate result of Defendants' unlawful practices.

83. The financial benefits derived by Defendants by reason of their unlawful conduct rightfully belong to Plaintiffs and the Classes, as they have paid anti-competitive prices during the Class Period, inuring to the benefit of Defendants.

84. It would be inequitable for the Defendants to be permitted to retain any of the overcharges for Online Music and CDs derived from Defendants' unfair and unconscionable methods, acts and trade practices alleged in this Complaint.

85. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and the Classes all unlawful or inequitable proceeds received by them.

86. A constructive trust should be imposed upon all sums unlawfully or inequitably received by Defendants traceable to Plaintiffs and the Classes from which Plaintiffs and the other Class members may make claims for restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court declare, adjudge and decree the following:

A. That this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for declaratory, equitable and injunctive relief, and Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to the claims for damages and other monetary relief, and declaring Plaintiffs as representatives of the Classes and their counsel as counsel for the Classes;

B. That the conduct alleged herein constitutes an unlawful contract, combination or conspiracy to restrain trade and fix and maintain prices in violation of §1 of the Sherman Act, of the state antitrust and unfair deceptive acts and practices statutes set forth herein, and the common law of unjust enrichment;

C. That Plaintiffs and the Classes are entitled to any additional damages, penalties and other monetary relief provided by applicable law, including treble damages;

1      D.     That Defendants disgorge money illegally obtained from the Classes as a result of

2  their unlawful activities and that members of the Classes are entitled to restitution.

3      E.     That Plaintiffs and each member of the Classes are entitled to the amounts by which

4  the Defendants have been unjustly enriched;

5      F.     That Defendants are enjoined from continuing the illegal activities alleged herein;

6      G.     That Plaintiffs and the Classes recover their costs of suit, including reasonable

7  attorneys' fees and expenses as provided by law; and

8      H.     That Plaintiffs and the Classes are granted such other, further, and different relief as

9  the nature of the case may require or as may be determined to be just, equitable, and proper by this

10  Court.

11                                  **JURY DEMAND**

12      Plaintiff demands a trial by jury on all issues so triable.

13  DATED: March 7, 2006              LERACH COUGHLIN STOIA GELLER
                                   RUDMAN & ROBBINS LLP

14                           JOHN J. STOIA, JR.
                           BONNY E. SWEENEY

15                           CHRISTOPHER M. BURKE
                           THOMAS G. WILHELM

16

17

18                                  JOHN J. STOIA, JR.

19                           655 West Broadway, Suite 1900
                           San Diego, CA  92101

20                           Telephone: 619/231-1058
                           619/231-7423 (fax)

21

22                           ROBBINS UMEDA & FINK, LLP
                           BRIAN J. ROBBINS

23                           610 West Ash Street, Suite 1800
                           San Diego, CA  92101
                           Telephone: 619/525-3990

24                           619/525-3991 (fax)

25                           Attorneys for Plaintiffs

26  R:\CptDraft\Antitrust\CPT Online Music.doc

27

28

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

ATTORNEY OF RECORD FOR PLAINTIFFS DENNIS BULCAO, ALEXANDER JUSTIS CLARK, MATT PUTMAN, McKENNA CREAMER, GEORGE CREAMER, P. EVAN STEPHENS, KIM HANSON, JAMES MILLER, WAYNE GILBERT, ELISE R. DeVORE and MITCHELL HORTON